IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:21CR166 |
| vs. | |
| DARNELL L. POLITE, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant's Motion to Suppress Statements and Evidence (Filing No. 26). An evidentiary hearing regarding this matter was held on December 7, 2021. A transcript has been filed. The Court asked for supplemental briefing, which has been received and this motion is now ripe for disposition.

For the reasons explained below, the undersigned will recommend that the motion be denied.

**FACTS**

On April 8, 2021, Omaha Police Sergeant Dan Martin ("Sergeant Martin") was on duty and responded to a call from dispatch regarding a criminal matter at 4005 Hartman Circle, Apartment 6, in Omaha, Nebraska. (TR. 5-6.) Sergeant Martin testified he was not directly dispatched to the address but responded to the call because the address is in an area where he had done previous investigations. (TR. 6; TR. 25.) Sergeant Martin testified he had received several shots fired complaints and drug complaints to addresses in the area in the past. (TR. 6.) However, Sergeant Martin stated that once dispatch had mentioned three down victims, he would have responded to the address regardless. (TR. 25.)

Sergeant Martin testified that 4005 Hartman Circle consists of apartments that are almost like townhomes divided by unit numbers and are close to one another. (TR. 8.) Sergeant Martin stated the apartments resemble small cottages or duplexes that are separated by ten to twenty feet. (TR. 8.) At the time he was dispatched, Sergeant Martin was in uniform and carrying a firearm. (TR. 5.) Sergeant Martin was also wearing an operational body camera.[1] (TR. 6.) Sergeant Martin testified it took him approximately five minutes to arrive on scene from the time of dispatch. (TR. 8.) The Omaha Fire Department Medics arrived at roughly the same time as Sergeant Martin. (TR. 8.)

Once at the address, Sergeant Martin entered Apartment 6 and observed three victims suffering from apparent drug overdoses. (TR. 8.) Sergeant Martin observed the medics administering Narcan to the victims. (TR. 9.) The victims were identified as Breeanna Tripp ("Ms. Tripp"), Jeremy Tripp ("Mr. Tripp"), and Raeann Young ("Ms. Young"). (TR. 8-9.) Sergeant Martin also observed lines of cocaine in the apartment. (TR. 10.) The Narcan did not help Ms. Young to become responsive, so she was transported to the hospital. (TR. 12.) After Ms. and Mr. Tripp received Narcan, they became responsive and Sergeant Martin was able to speak to them about what was happening. (TR. 10.) Ms. Tripp told him that she got the drugs two doors down and Mr. Tripp said the drugs came from Apartment 8. (TR. 10.) They did not identify the individual who provided them the drugs. (TR. 27.) They indicated to Sergeant Martin that they had just gotten the drugs. (TR. 10.) Prior to this time, Sergeant Martin did not know Mr. or Ms. Tripp. (TR. 23-24.) Sergeant Martin testified that because the Tripps had just regained consciousness, he could not be confident of their mental state. (TR. 24.) However, Sergeant Martin stated Mr. and Ms. Tripp's answers to his questions were responsive. (TR. 33.) Sergeant Martin also stated that the information he received from Mr. and Ms. Tripp was the best information he had at the time. (TR. 33.)

Sergeant Martin testified that based on this information from Mr. and Ms. Tripp, he became concerned that they received a bad batch of narcotics and that there could potentially be more

---

[1] The body camera started recording just before Sergeant Martin's arrival at 4005 Hartman Circle. (TR. 7; Ex. 1.) Sergeant Martin testified that he could not recall if he turned his body camera off during the event, but if he did, there would be a break in sequence in terms of what the video file would say in terms of its time. (TR. 7.) Sergeant Martin testified that if he turned the camera off, it was so he could speak about confidential investigative matters. (TR. 7.)

2

victims in Apartment 8 or that more of the bad batch of narcotics could be sold and cause harm to others. (TR. 10-11.) Sergeant Martin stated he had previously received citizen complaints about potential drug use and sales at Apartment 8. (TR. 11.) Sergeant Martin testified that there had been some controlled buys done from Apartment 8 and that one reason he responded to the call was based on his previous involvement with Apartment 8. (TR. 25; Ex. 3.) Sergeant Martin testified that in his experience with drug investigations, there is almost always drug use occurring at locations where there are drug sales.[2] (TR. 11.) Sergeant Martin testified that his experience with drug investigations also led him to believe there could be additional victims at Apartment 8. (TR. 11.)

Sergeant Martin testified that almost immediately after receiving the information from Mr. and Ms. Tripp, he went to Apartment 8. (TR. 11.) Sergeant Martin testified he believed getting to Apartment 8 was urgent because the Tripps had just purchased the cocaine and the occupants of Apartment 8 could also have used it. (TR. 12.) Sergeant Martin stated he was also concerned that if someone else came and went from Apartment 8 with this same batch of narcotics, it could be deadly. (TR. 12.) Sergeant Martin further testified that he was also concerned about the destruction of evidence which could have been used to identify the narcotic Ms. Young was suffering from. (TR. 33.)

Sergeant Martin testified that once he got to Apartment 8, he made the decision to not allow anyone to come or go from the apartment. (TR. 12.) Sergeant Martin knocked on the door of the apartment and a couple other officers went to cover the rear of the apartment. (TR. 12; TR. 25.) Sergeant Martin stated that the door of the apartment had a window and he was able to see an awake and alert female through the window. (TR. 25-26.) The female then answered the door. (TR. 12.) Sergeant Martin told the female that officers were going to be securing the apartment complex and that he was going to come in the apartment to check if there were additional victims. (TR. 12.) The female opened the door, but she did not want Sergeant Martin to come inside so he forced entry into the apartment with his firearm drawn. (TR. 13; TR. 27.) The female did not tell Sergeant Marin that there were any overdose victims in the apartment. (TR. 26.) Sergeant Martin

---

[2] Sergeant Martin has been an officer with the Omaha Police Department for seventeen years and currently works in the uniform patrol bureau. (TR. 4-5.) Sergeant Martin was the sergeant in charge of the north gang unit, which conducts gang investigations, narcotics investigations, firearms investigations, wiretaps, and an assortment of other things. (TR. 5.)

testified he did not wait for a warrant to enter the apartment because it was urgent to see if there were additional victims. (TR. 13.)

Sergeant Martin stated that as he entered the apartment, officers announced their presence and encountered five people, including Defendant. (TR. 13-14.) Sergeant Martin testified that these individuals were then handcuffed and detained for officer safety and further investigation. (TR. 15; TR. 27.) Everyone, except Defendant, were taken outside the apartment so officers could clear the apartment to check for threats or unconscious people. (TR. 15.) Officers went through each room of the apartment looking for potential overdose victims. (TR. 13-14.) Sergeant Martin testified the search was limited to finding potential victims. (TR. 14.) Sergeant Martin testified that during the sweep of the apartment, Officer Martinez observed marijuana in one of the bedrooms in plain view. (TR. 14.) Officers did not locate any additional victims. (TR. 14-15.) After the apartment was cleared, the individuals were allowed back in the apartment because it was cold and raining outside.[3] (TR. 15-16.) Sergeant Martin told everyone they were witnesses and could not talk about the case. (Ex. 1.) Sergeant Martin stated the reason Defendant remained in the apartment was because Defendant only had one leg. (TR. 17.)

After the apartment was cleared, and before the other individuals were allowed back in the apartment, Sergeant Martin spoke to Defendant and asked if the apartment belonged to him. (Ex. 1.) Defendant responded that it did. (Ex. 1.) Sergeant Martin told Defendant why officers were at his apartment and asked Defendant for consent to search. (TR. 15; Ex. 1.) Defendant denied knowing anything about the situation and would not provide consent to search. (TR. 15; Ex. 1.) Sergeant Martin told Defendant that he was not saying that Defendant was responsible for anything, but that officers were going to apply for a warrant to see whether a judge would allow the search. (Ex. 1.) Defendant told Sergeant Martin that was fine. (Ex. 1.) Sergeant Martin again told Defendant he was not saying Defendant sold the drugs to the individuals in apartment 6. (Ex. 1.) Sergeant Martin stated that if it turned out that the situation in the other apartment had nothing to do with Defendant's place, then it was just a big misunderstanding and officers would leave. (Ex. 1.) Sergeant Martin told Defendant that it was going to take a couple hours to get a warrant, so they were going to just hang out for a bit. (Ex. 1.) Sergeant Martin explained to Defendant that

---

[3] After all occupants of the apartment, except Defendant, were taken outside, one woman that had been in the apartment was arrested and taken downtown because drugs were found in her bag.

4

he was not investigating Defendant personally, but instead was investigating the apartment. (Ex. 1.)

Sergeant Martin testified that he instructed Omaha Police Detective Cortes Clark ("Detective Clark") and Officer Ramsey to start preparing a search warrant. (TR. 15.) Sergeant Martin testified that as the search warrant was being prepared, the only searching that took place was done for purposes of determining where individuals could be seated for officer safety, such as searches for weapons under couch cushions. (TR. 16.) Sergeant Martin asked Defendant if it was ok to search the couch cushions and anything within reach of anyone sitting on the couches for weapons. (Ex. 1.) Defendant indicated it was ok for officers to search the living room area and couches for weapons. (Ex. 1.) No contraband was found during this search. (TR. 16.) Sergeant Martin testified that no interrogation occurred while they were waiting for the search warrant, but there was some banter and conversation with Defendant, including a discussion about the amputation of Defendant's leg. (TR. 16-17; Ex. 1.) Defendant insisted on showing officers videos on his phone regarding him cutting off portions of his foot, which Defendant indicated were in his barbeque grill right outside the door. (Ex. 1.) Defendant also had officers go look for the bag containing part of his foot in the barbeque grill. (Ex. 1.) Sergeant Martin testified his conversations with Defendant during this period were not designed to elicit any sort of information about the case. (TR. 17.)

Sergeant Martin testified it took approximately three hours for the search warrant to arrive. (TR. 17; Ex. 3.) Detective Clark brought the warrant to the apartment around 9:30 p.m. and officers then searched the apartment and located methamphetamine, marijuana, and a firearm. (TR. 18; TR. 31; TR. 36; Ex. 3.) Sergeant Martin then instructed officers to begin arresting some individuals, one of whom was Elijah Granger ("Mr. Granger"), Defendant's cousin. (TR. 18; TR. 31.) Mr. Granger was then led out of the apartment. (TR. 31.) Defendant was told he was going to be transported to jail for the items that were found in the apartment. (Ex. 1.) Defendant indicated that he understood. (Ex. 1.)

Shortly after this, Defendant asked Sergeant Martin what they were doing with Mr. Granger. (Ex. 1.) Sergeant Martin responded that Mr. Granger was going to jail. (Ex. 1.) Defendant asked Sergeant Martin what Mr. Granger was going to jail for. (Ex. 1.) Sergeant Martin told Defendant it was for the dope in the apartment. (Ex. 1.) Defendant then told Sergeant Martin

5

that Mr. Granger did not do anything wrong. (Ex. 1.) Sergeant Martin told Defendant there was dope in the apartment and because they both lived there, Mr. Granger was going to jail. (Ex. 1.) Defendant then again told Sergeant Martin that Mr. Granger did not have a clue about what was happening. (Ex. 1.) Defendant told Sergeant Martin that Mr. Granger just came from California and did not know what was going on. (Ex. 1.) Defendant then continued to explain why Mr. Granger did not know anything about what was going on in the apartment. (Ex. 1.) After this, Sergeant Martin went outside where Mr. Granger was located and told officers Mr. Granger was going to be released. (Ex. 1.) Sergeant Martin testified his statements about putting Mr. Granger in custody were not designed to elicit incriminating information. (TR. 19.) Sergeant Martin testified he was just responding to Defendant's questions about what was going on. (TR. 19-20.)

After Sergeant Martin came back inside after telling officers they could release Mr. Granger, he smelled gas in the apartment and wanted to contact the landlord. Defendant provided the landlord's name and instructed officers to use his phone to call the landlord. (Ex. 1.) Defendant then started talking about Mr. Granger again saying Mr. Granger did not know anything about what was going on in the apartment. (Ex. 1.) Sergeant Martin stopped Defendant and told him before he said anything else, he needed to advise Defendant of his rights. (Ex. 1.) Sergeant Martin then *Mirandized* Defendant. (TR. 20; Ex. 1.) Sergeant Martin testified that once *Mirandized*, Defendant continued to engage officers in conversation. (TR. 20.) Sergeant Martin stated he was not trying to ask Defendant any questions or elicit information with respect to the case. (TR. 20.) Sergeant Martin testified that Defendant was not under arrest until the narcotics and firearm were found in the apartment. (TR. 21.) Mr. Granger, as well as the other individuals in the living room, were not arrested and Mr. Granger was allowed to stay overnight in Defendant's apartment. (TR. 31.)

Detective Clark testified that after the apartment was searched, he spoke to Defendant off the record about becoming a confidential informant ("CI"). (TR. 36.) Detective Clark testified he believed he spoke to Defendant after he was *Mirandized* but was not sure. (TR. 38-39.) Detective Clark did not provide Defendant a *Miranda* advisement. (TR. 38.) Detective Clark testified that he took Defendant to a backroom in the apartment and turned off his body camera. (TR. 38.) Detective Clark testified that turning off body cameras during these types of conversations is consistent with Omaha Police Department policy and that he normally turns off his body camera

6

when he speaks to a potential CI to keep the CI confidential and for the protection of the CI. (TR. 37-38.) Detective Clark testified he asked Defendant if he would be willing to work off his charges or work with the officers. (TR. 39.) Detective Clark stated Defendant declined the offer and the conversation ended. (TR. 39.) Detective Clark testified he did not ask Defendant any questions about items in the house or question him about the search or events that led to the search. (TR. 39.) Detective Clark stated Defendant did not make any comments about those matters.[4] (TR. 39.) At that point, Detective Clark took Defendant back to the living room of the apartment. (TR. 40.) Detective Clark later took Defendant to Central Headquarters and spoke to him again about becoming a CI. (TR. 40.) Defendant did not make any statements to Detective Clark at that time. (TR. 40.)

### DISCUSSION

Defendant contends his Fourth Amendment rights were violated when officers entered his apartment without a search warrant and, therefore, all evidence—including the statements he made to officers after they entered his apartment—should be suppressed. Defendant also argues the statements he made to officers should be suppressed because he was detained without reasonable suspicion and because his *Miranda* rights were violated. The undersigned finds these arguments unpersuasive.

1. **Entry into Defendant's Apartment**

"The Fourth Amendment prohibits a warrantless entry of a home by law enforcement officers unless the circumstances are within a reasonableness exception to the warrant requirement." *United States v. Clarke,* 564 F.3d 949, 958–59 (8th Cir. 2009). The exigent-circumstances exception to the warrant requirement "justifies immediate police action without obtaining a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed." *United States v. Ramirez,* 676 F.3d 755, 759 (8th Cir. 2012) (quotation omitted). An "exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury" because "[t]he need to protect or preserve life or avoid

---

[4] The government does not intend to use any of Defendant's statements to Detective Clark in its case. (TR. 61-62.) Because the government will not use these statements, the undersigned will not address their admissibility in this Findings and Recommendation. The Court notes that per Exhibit 1, it appears the conversation Detective Clark had with Defendant occurred after he was advised of *Miranda*.

7

serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quotation omitted). Therefore, law enforcement "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. Law enforcement must have an "objectively reasonable basis to believe that entry is necessary" to render such emergency assistance. *United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021). When examining whether officers had a reasonable basis to enter a home without a warrant, the court "look[s] to the facts known to the officers at the time they made the decision to enter." *Id*.

Here, exigent circumstances existed which justified the warrantless entry. Officers found three unresponsive individuals suffering from apparent drug overdoses in Apartment 6. The medics who arrived at the scene administered Narcan to the victims, but Ms. Young remained unresponsive. After Ms. and Mr. Tripp received Narcan and came to, they were able to tell Sergeant Martin what had happened. Ms. Tripp told him that she got the drugs two doors down and Mr. Tripp said the drugs came from Apartment 8. They indicated to Sergeant Martin that they had just received the drugs. Sergeant Martin testified he was concerned that the Tripps and Ms. Young received a bad batch of narcotics and that there could potentially be more victims in Apartment 8 or that more of the bad batch of narcotics could be sold and cause harm to others. Sergeant Martin testified that he did not wait for a warrant to enter the apartment because it was urgent to check for additional victims as the Tripps had just purchased the drugs. Sergeant Martin testified that his experience with drug investigations also led him to believe there could be additional victims in Apartment 8. Sergeant Martin further testified that he was concerned about the destruction of evidence which could have been used to identify the narcotic Ms. Young was suffering from. Sergeant Martin stated he previously received citizen complaints about potential drug use and sales at Apartment 8 and that there had been some controlled buys from Apartment 8. Sergeant Martin testified that based on his experience with drug investigations, there is almost always drug use occurring at locations where there are drugs being sold. Based on the facts known to officers at the time, there was an objectively reasonable basis to enter the apartment.

### 2. Detention

Defendant argues his constitutional rights were violated when he was detained by officers while they secured a search warrant. The undersigned disagrees as there was probable cause and

a reasonable basis for the detention.  *Illinois v. McArthur,* 531 U.S. 326 (2001) is instructive.  In *McArthur*, police were informed that the defendant possessed drugs. The defendant refused to provide consent to search his home, so officers detained him on the front porch for two hours while they obtained a search warrant. Upon execution of the warrant, police found marijuana and drug paraphernalia. The defendant argued his detention was unreasonable under the Fourth Amendment. The Supreme Court disagreed, finding the detention was reasonable because (1) police had probable cause to believe contraband was in the home; (2) police had good reason to fear that the defendant might destroy evidence; (3) officers balanced law enforcement needs with the demands of personal privacy by neither searching the trailer nor arresting the defendant while obtaining the warrant; (4) the restraint was only imposed for a limited period of time.  *See also United States v. Cantu,* 405 F.3d 1173 (10th Cir. 2005) (finding two-and-a-half-hour detention of the defendant while police secured a warrant for search of a car reasonable).

Defendant's constitutional rights were not violated by the detention.  The two-hour and forty-eight-minute detention while waiting for the warrant was reasonable and supported by probable cause.[5]  As discussed above, officers entered the apartment because they believed there could be additional overdose victims. The officers also believed contraband was in the apartment based on what Mr. and Ms. Tripp told officers.  This belief was confirmed during the lawful sweep of the apartment when officers observed drugs in plain view, thus giving them probable cause to believe the apartment contained evidence of a crime.  Officers also believed that evidence could be destroyed if the five occupants of the apartment were not restrained.[6]  The officers did not search the apartment until the warrant was obtained and nothing in the record indicates that the

---

[5] Defendant's continued detention for forty-two minutes during the search of the apartment was likewise permissible. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the instruction to be imposed by the seizure.'" *Muehler v. Mena,* 544 U.S. 93, 99 (2005) (quoting *Michigan v. Summers,* 452 U.S. 692, 705, n.19 (1981)).

[6] To the extent Defendant contends the officers' use of handcuffs to restrain him during the detention was unreasonable, the undersigned disagrees.  The use of handcuffs on the five occupants was a reasonable precaution to protect the officers' safety and maintain the status quo.  *Muehler v. Mena,* 544 US 93, 100 (2005) (officers acted reasonably by detaining occupant of residence in handcuffs for two to three hours while search was in progress); *United States v. Martinez,* 462 F.3d 903, 907 (8th Cir.2006) (finding that officers may use handcuffs as a reasonable precaution to protect officers' safety and maintain the status quo during a *Terry* stop); *United States v. Navarrete-Barron,* 192 F.3d 786, 791 (8th Cir. 1999) (stating use of handcuffs can be a reasonable precaution during a *Terry* stop).

officers failed to act diligently in pursuing and obtaining the warrant.[7] Accordingly, the undersigned finds the detention was reasonable.

### 3. Statements

*Miranda* warnings are required when a person is interrogated by law enforcement after being taken into custody. *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quotation omitted). "Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "To determine whether a defendant was in custody for *Miranda* purposes, a court looks to the totality of the circumstances confronting the defendant at the time of the interview, and asks whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest." *Huether*, 673 F.3d at 794 (quotation omitted). "The inquiry is an objective one, without consideration of the participants' subjective views." *Id*. "The issue turns on whether a reasonable person in the suspect's shoes would have felt free to end the interview." *United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020). "Depending on the totality of the circumstances, questioning of those being detained during a warrant search may or may not cross the line and become custodial interrogation requiring *Miranda* warnings." *Id*. *See also United States v. Burns*, 37 F.3d 276, 281 (7th Cir. 1994) ( "[I]n the usual case, a person detained during the execution of a search warrant is not "in custody" for purposes of *Miranda*").

Courts have found the following non-exhaustive factors relevant to the custody inquiry: (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or (6) whether the suspect was placed under arrest at the end of questioning ("*Griffin* factors"). *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Other considerations in determining custody may include the "purpose, place and length of the interrogation." *Id*. The *Griffin* factors "are not by any means exclusive, and . . . 'custody'

---

[7] Officers did search the couch cushions in the living room for weapons prior to bringing Defendant's cousin and friends back into the apartment to sit on the couches while they waited for the search warrant. The search of the couch cushions was with Defendant's consent and nothing of evidentiary value was found. (Ex. 1.)

cannot be resolved merely by counting up the number of factors on each side of the balance." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

Based on the facts of this case, the undersigned finds Defendant was not in custody for purposes of *Miranda* until he was told he was going to jail. Therefore, any statements Defendant made up to this point did not implicate *Miranda*. Throughout the encounter, Defendant voluntarily initiated contact with officers and engaged them in friendly conversation. One such conversation involved Defendant's explanation of his leg being amputated. At one point, Defendant even insisted that officers watch videos on his phone regarding him cutting off portions of his foot, which Defendant indicated were in his barbeque grill right outside the door. Defendant also encouraged the officers go look for the bag that contained parts of his foot in the barbeque grill, which the officers did. Defendant's interaction with officers was not forced or coerced.

Also, Defendant knew *why* the officers were present—which was not because he was under arrest. Sergeant Martin told Defendant that everyone was being detained because they were witnesses to potential criminal activity. Sergeant Martin explained to Defendant why they were at his apartment. Sergeant Martin told Defendant that three people had overdosed on cocaine and one of them may not make it and they advised they had just bought the drugs from his apartment. Sergeant Martin further explained to Defendant they wanted to search his apartment for any evidence related to what happened in Apartment 6. Defendant indicated he had no knowledge of anything that occurred and Sergeant Martin explained to Defendant several times that he was not saying that Defendant was the one that sold the drugs to them. Sergeant Martin explained to Defendant that he was not investigating Defendant personally, but instead was investigating the apartment.

After Defendant denied Sergeant Martin's request to search the apartment, Sergeant Martin told Defendant the officers were going to apply for a search warrant and the judge would determine if there was enough probable cause to search the apartment. Defendant said that was fine. Sergeant Martin explained they were doing what they were doing due to the exigency of the situation because the individuals who overdosed were very sick due to what they believe came from Defendant's apartment. Sergeant Martin stated that if it turned out that the situation in the other apartment had nothing to do with Defendant's apartment, then it was just a big misunderstanding and officers would leave. Sergeant Martin told Defendant that it was going to take a couple hours

to get a warrant, so they were going to just hang out for a bit until a determination is made by the judge whether to approve the warrant. Defendant continued to ask questions, which Sergeant Martin answered and again told Defendant he was not investigating Defendant but was investigating his apartment. Sergeant Martin also informed Defendant he did not have any indication that Defendant was responsible for providing anything to the individuals who overdosed. Sergeant Martin explained that it just so happened to be Defendant's apartment and there are a lot of people at his apartment right now. Even though Defendant was ultimately arrested, all other individuals in the living room with Defendant were released. Mr. Granger, Defendant's cousin, was even permitted to take custody of the apartment and stay in the apartment that night.

Additionally, there is no indication that officers used strong arm tactics or deceptive strategies to get Defendant to speak.[8] The officers were upfront with Defendant about what was going on. Sergeant Martin explained that officers were getting a warrant because they were investigating Defendant's apartment in connection with the overdoses in Apartment 6. Defendant indicated he understood what was happening. The atmosphere in the apartment was relaxed while they waited for the warrant. There were only two officers with the four occupants in the apartment most of the time. One of the officers was in the living room with the four individuals and the other officer was in the kitchen. Sergeant Martin entered and exited the apartment throughout the encounter. Officers did not raise their voices and treated the occupants with respect. Any conversations Defendant had with officers were very short in duration. Also, the conversations occurred in front of everyone else in Defendant's apartment—on Defendant's own turf—reducing any feeling that the atmosphere was police dominated. *See United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002) ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."); *Wilson v. Coon*, 808 F.2d 688, 689-90 (8th Cir. 1987) ("Public exposure reduces the likelihood that law-enforcement agents will use

---

[8] At one point, officers indicated to Defendant, and everyone else in the living room, that the investigation into Defendant's apartment could turn out to be a homicide investigation. It seems from the recording of the situation these comments may have been made after officers knew all the overdose victims had been revived. The undersigned does not believe this rises to the level of a deceptive strategy because even though the individuals had been revived, it does not necessarily follow that they would absolutely survive the overdoses. Sergeant Martin told the individuals in the living room that three individuals were not "out of the woods yet." Further, the situation did not become custodial simply because the officers advised Defendant "of the potential courses and consequences of a criminal investigation" and let him "weigh his options and make an informed decision whether cooperation that involved incriminating disclosures might be in his best interest." *Roberts*, 975 F.3d at 717 (quotation omitted).

oppressive or abusive tactics and renders the situation less police-dominated."). Further, the officers' presence in the apartment was not any longer than necessary to obtain and execute the warrant.

Even though Defendant was placed in handcuffs while they waited for the warrant, this fact alone does not render him in custody as Defendant argues. As stated by the Eighth Circuit, "the bare fact of physical restraint does not itself invoke the *Miranda* protections" and "a restraint on freedom of action does not *ipso facto* create a situation in which *Miranda* warnings are necessary." Wilson v. Coon, 808 F.2d 688, 689-90 (8th Cir. 1987). *See also* United States v. Roberts, 975 F.3d 709, 716 n.2 (8th Cir. 2020) ("handcuffing for officer safety and supervision during an interview do not render the interrogation custodial"); Muehler v. Mena, 544 U.S. 93 (2005) (finding that officers acted reasonably by detaining occupant in handcuffs for two to three hours while search of home was in progress). As recognized by the Supreme Court in Michigan v. Summers, 452 U.S. 692, 702-03 (1981), a search for narcotics "is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence" and the "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." In the situation at hand, officers had three overdose victims who said they got the drugs from Defendant's apartment and officers had observed drugs in plain view. The apartment had multiple occupants and it was reasonable for officers to restrain them for officer safety and to maintain the status quo and prevent the destruction of evidence until the warrant arrived.[9] Therefore, for these reasons, and the reasons explained above, the undersigned finds Defendant was not in custody for purposes of *Miranda* until he was told he was going to jail.

The statements Defendant made after he was told he was going to jail should not be suppressed because they were not the product of interrogation, but instead were voluntary

---

[9] The undersigned notes that Defendant's own statements during the encounter indicate he did not consider himself to be in custody. Following the search, Sergeant Martin told Defendant he was going to jail for what was found in the apartment. Sergeant Martin then instructed officers to begin arresting some individuals. After Mr. Granger was taken out of the apartment, Defendant asked Sergeant Martin what was happening to Mr. Granger. Sergeant Martin told Defendant that Mr. Granger was going to jail. Defendant informed the officers that Mr. Granger did not have any idea of what was going on and did not know anything. Up to that point, Defendant had not expressed any concern regarding Mr. Granger's lack of involvement in the situation. The content and timing of Defendant's statements regarding Mr. Granger indicates Defendant did not consider the occupants of the apartment, or himself, in custody until he was told he was under arrest.

statements.[10] "Interrogation" is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). This standard is objective and "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* "Thus, not all government inquiries to a suspect in custody constitute interrogation and therefore need be preceded by *Miranda* warnings." *United States v. Mclaughlin*, 777 F.2d 388, 391 (8th Cir. 1985).

"Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016). It is well-established that "[i]n most cases where an officer responds to a defendant's question, his response does not amount to an interrogation." *United States v. Smialek*, 970 F.3d 1070, 1073 (8th Cir. 2020). Further, "statements made in response to a law enforcement officer's attempt to seek clarification of a defendant's remarks, during an interview requested by the defendant, are not the products of interrogation." *United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998).

Defendant maintains the statements he made about Mr. Granger were the product of interrogation. This is clearly not the case. Defendant's statements related to Mr. Granger were unsolicited and any follow-up statements or questions posed by officers were in response to Defendant's inquiries and for clarification. The record shows that when Mr. Granger was led outside, Defendant asked Sergeant Martin what they were doing with his cousin, and Sergeant Martin explained that Mr. Granger was going to jail for the drugs in the apartment. Upon learning this, Defendant told Sergeant Martin that Mr. Granger did not do anything wrong and did not know

---

[10] Because the undersigned has found that Defendant was not in custody until he was told he was going to jail, the undersigned will not address the admissibility of any of Defendant's statements made prior to that time. However, even if one were to find that Defendant was in custody prior to being told he was going to jail, *Miranda* was nevertheless not violated because Defendant was not interrogated. Defendant's statements were made in response to requests for routine information or were unprompted remarks, questions, or responses to officers' attempts to clarify voluntary statements made by Defendant. *See United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (stating that a routine identification inquiry "is not interrogation under *Miranda*, even if the information turns out to be incriminating") (quotation omitted); *United States v. Tapia-Rodriguez*, 968 F.3d 891, 894-95 (8th Cir. 2020) (finding that the defendant was not interrogated when an officer asked him whether he lived in the apartment to be searched because the question was a request for routine information necessary for basic identification purposes); *United States v. Walker*, 871 F. Supp. 1 (D.D.C. 1994) (denying motion to suppress statements, finding that the defendant pointed out his bedroom in response to a routine question during execution of a search warrant—not one designed to elicit an incriminating response); *Bailey*, 831 F.3d at 1038 (stating that voluntary statements are admissible even if the defendant had not been provided *Miranda* warnings).

what was happening because he had just come from California. Sergeant Martin's responses to Defendant's statements were to clarify what Defendant was telling him.

After Sergeant Martin came back inside after telling officers they could release Mr. Granger, Sergeant Martin dealt with the smell of gas in the apartment and getting ahold of Defendant's landlord. Defendant voluntarily and spontaneously continued talking about Mr. Granger and again said Mr. Granger did not know anything about what was going on in the apartment. At that point, Sergeant Martin stopped Defendant and told him before he said anything else, he needed to advise Defendant of his rights. Sergeant Martin then *Mirandized* Defendant. Sergeant Martin testified his statements about putting Mr. Granger in custody were not designed to elicit incriminating information from Defendant and he was just responding to Defendant's questions about what was going on. The evidence supports Sergeant Martin's testimony.

After Defendant was advised of his *Miranda* rights, he indicated he understood his rights and continued to talk to the officers. Sergeant Martin testified that once *Mirandized*, Defendant continued to engage officers in conversation by voluntarily making statements. The recording of the encounter supports Sergeant Martin's testimony. However, during that time, Sergeant Martin did not interview Defendant. They instead engaged in a conversation about calling his landlord about the gas leak and whether Mr. Granger could stay in the apartment. The only question Sergeant Martin asked Defendant after the *Miranda* advisement related to the facts of this case was if the drugs in the house belonged to him. Defendant denied the drugs found in the house belonged to him. Based on the evidence before the Court, it does not appear that Defendant made any incriminating statements following his *Miranda* advisement.

To the extent Defendant contends he was forced to speak to officers, the undersigned finds this contention without merit. Defendant's statements to the officers were completely voluntary. "Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by their maker. A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (internal quotations and citations omitted). "The appropriate test for determining whether a statement or confession is voluntary is whether the alleged statement or confession was extracted by threats, violence, or direct or indirect promises, such that [an individual's] will is overborne and his . . . capacity for self-determination critically impaired."

15

United States v. Gipp, 147 F.3d 680, 683 (8th Cir. 1998) (internal quotation omitted). In deciding whether a suspect's statements were made voluntarily, courts consider the totality of the circumstances. United States v. Estey, 595 F.3d 836, 839 (8th Cir. 2010).

The record does not reflect that Defendant's will was overborne or his capacity for self-determination impaired. Defendant's statements were not extracted by threats, violence, or promises. Defendant's interaction with officers was conversational in nature. Officers did not engage in any coercive activities. At one point, Detective Clark spoke to Defendant off the record about becoming a CI. Detective Clark testified that Defendant almost immediately refused this offer and returned to the living room. This brief interaction indicates that Defendant did not feel intimidated by officers or pressured to make statements or take any actions. In addition, Defendant denied the officers' request to search the apartment. Also, this was not Defendant's first contact with law enforcement. (Ex. 4.) From the very beginning of his encounter with officers, Defendant had no problem telling them no. Considering the totality of the circumstances, the undersigned finds Defendant's statements were not involuntary or coerced.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Brian C. Buescher that Defendant's Motion to Suppress Statements and Evidence (Filing No. 26) be denied.

Dated this 14th day of March, 2022.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

**ADMONITION**

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.